421 S.E.2d 682

**Delores Ann ADKINS, Wanna Buzzard, Carmel Rose Dooley, Charles John Gibson, Bonita Jarrell, Gary R. Kinder, Christine L. Pauley, Tamala G. Pauley, Patricia Sanders, Deen Ann Smith, Conya G. Wells, and Rebecca L. Workman, Plaintiffs Below, Appellants,**

v.

**Jennings P. MILLER, Individually and as Sheriff of Boone County, West Virginia, Defendant Below, Appellee.**

No. 20273.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 28, 1992.

Decided July 23, 1992.

John R. Mitchell, Charleston, for appellants.

Daniel R. Schuda, Cynthia R. Tribble, Steptoe & Johnson, Charleston, for appellee.

McHUGH, Chief Justice:

This appeal by twelve former employees (appellants) of the Sheriff of Boone County is from the final order of the Circuit Court of Boone County dismissing their complaint. Apparently, the trial court sustained the motion to dismiss made by the appellee, Jennings P. Miller, Sheriff of Boone County, under Rule 12(b)(6) of the *West Virginia Rules of Civil Procedure* for failure to state a claim upon which relief could be granted.[1] The trial court

---

1. Neither the appellee, in his written motion to dismiss, nor the trial court, in its final order, cite any procedural rule as grounds for the dismissal. The order of the trial court states simply: "That, inasmuch as the [appellants'] claim that they were discharged is incorrect, their claim that they were improperly dis-

dismissed the complaint with prejudice. Appellants sought reinstatement to their former positions of employment, back pay and damages. Upon review of the record, we conclude that the trial court erred in dismissing the complaint.

The appellants were employed in the Sheriff's Tax Office of Boone County by Sheriff Vernon F. Harless during his term of office. Sheriff Harless' term of office expired on December 31, 1988, due to the election of the appellee as sheriff. The appellee succeeded Sheriff Harless as Sheriff of Boone County on January 1, 1989.

The appellants' complaint alleges that they reported to work on the first work day of 1989, but were told by the appellee that he had "hired his own people." Although the appellee did not technically "fire" the appellants, he did tell them to leave. Appellants contend that the appellee informed them that they were employees of Sheriff Harless and that he (appellee) wanted employees that would be loyal to him and that supported him. The complaint further alleges that: "The [appellee] intentionally, willfully and wantonly dismissed the [appellants] because the [appellants] had, or were believed or presumed to have had, affiliations, political or otherwise, with either the Republican Party or with other political personages or groups whose interests were opposed to those of the [appellee]."

Appellants base their complaint upon three separate causes of action, all of which are premised upon the idea that the appellee acted to terminate the employment of appellants in violation of their constitutionally protected rights.

The trial court's order granting the appellee's motion to dismiss was based upon its interpretation of *W.Va.Code*, 7–7–7 [1982]. *W.Va.Code*, 7–7–7 [1982] states, in pertinent part:

The county clerk, circuit clerk, joint clerk of the county commission and circuit court, if any, sheriff, county assessor and prosecuting attorney, by and with the advice and consent of the county commission, may appoint and employ, to assist them in the discharge of their official duties for and during their respective terms of office, assistants, deputies and employees.

The trial court held, "That West Virginia Code § 7–7–7 [1982] provides that a Sheriff may employ persons to assist him in the performance of his duties *only* for and during his term of office." (emphasis added). Therefore, the trial court granted the appellee's motion to dismiss because it found that the appellants had been discharged by operation of the law (*W.Va.Code*, 7–7–7 [1982]) rather than by any action of the appellee. For the reasons that follow, we find the trial court's dismissal of the complaint for the reason stated to be error, and we therefore remand this case for further proceedings.

In a series of three cases, the United States Supreme Court has repeatedly held that dismissals of non-civil service protected employees are improper and violative of first amendment rights when made for political patronage reasons. There are exceptions to this general rule; specifically, governmental employees who maintain a confidential and/or policy-making position in regard to an elected official may be terminated for political reasons. The Sixth Circuit Court of Appeals in *Faughender v. City of North Olmsted, Ohio,* 927 F.2d 909 (6th Cir.1991) has offered a concise but inclusive synopsis of the three Supreme Court decisions which have held "that a governmental unit violates the first amendment if it makes certain personnel actions for political reasons."[2] *Id.* at 912. That court stated:

charged is also refuted by the applicable statutes."

Because the trial court determined that appellants' claims were "incorrect," we will treat the motion to dismiss and dismissal order as coming under the scope of Rule 12(b)(6) of the *West Virginia Rules of Civil Procedure.* Rule 12(b)(6) states, in pertinent part, "[T]he following defens-

es may at the option of the pleader be made by motion: ... failure to state a claim upon which relief can be granted[.]"

**2.** In *Faughender* a mayor's secretary was not rehired upon the election of a new mayor. She alleged that she had been denied her former position for political reasons in violation of her

The [Supreme] Court first considered this question in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The court in *Elrod* held that a governmental unit violated the first amendment by installing a traditional patronage system of government employment, wherein every government employee not covered by civil service could be fired for strictly political reasons. There was no majority opinion, but the opinion for the plurality stated that politically-motivated firings violate the first amendment by restraining the freedom of the fired employee to hold whatever political beliefs he desires, and to associate with others to advance those beliefs. *Elrod*, 427 U.S. at 355–60, 96 S.Ct. at 2680–83. It stated that a government could constitutionally fire an employee for political reasons, however, if the government could demonstrate that a 'vital government end' would be achieved by means ' "closely drawn to avoid unnecessary abridgement...." ' *Elrod*, 427 U.S. at 363, 96 S.Ct. at 2684–85 (citation omitted). It also stated that governments have a vital interest in ensuring that 'representative government not be undercut by tactics obstructing the implementation of policies of the new administration,' *Elrod*, 427 U.S. at 367, 96 S.Ct. at 2687, but that this interest extended only to 'confidential' employees in 'policymaking positions' because such a limitation was the least restrictive means of achieving the government's legitimate interest in patronage dismissals. *Elrod*, 427 U.S. at 372, 96 S.Ct. at 2689.

The Court affirmed and clarified its holding in *Elrod* in *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). The Court majority in *Branti* reaffirmed the holdings of the *Elrod* plurality that patronage dismissal violated the first amendment, and that permitting politically-motivated dismissals of persons in certain politically sensitive positions is necessary to uphold a vital governmental interest. *Branti*, 445 U.S. at 513–16, 100 S.Ct. at 1292–94. The Court

in *Branti*, however, reformulated the scope of permissible patronage. The *Branti* Court held that 'the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.' *Branti*, 445 U.S. at 518, 100 S.Ct. at 1295.

In its last term, the Court eliminated any thought that the dictates of *Elrod* and *Branti* would be limited to firings. In *Rutan v. Republican Party of Illinois*, [497] U.S. [62], 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), the Court upheld the rationale of both *Elrod* and *Branti*, and extended their reach to other common varieties of patronage preferment: hirings, transfers, promotions, and recalls from layoffs.

*Id.* at 912.

In *Rutan* the then-Governor of Illinois had issued an executive order proclaiming a hiring freeze pertaining to approximately 60,000 state jobs. No exceptions were permitted without the "express permission" of the governor. The governor screened all requests for his "express permission" through an office of personnel. Approval of the office of personnel was required for all hiring, promotional, transfer and recall after layoff decisions. The office of personnel made its decisions based upon political considerations.

The *Rutan* Court noted that the First Amendment to the *United States Constitution* prohibits the use of political considerations when making job decisions: "The First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate." 497 U.S. at 76, 110 S.Ct. at 2738, 111 L.Ed.2d at 67. The Supreme Court also reiterated the precedent established in *Elrod* and *Branti*. It noted that those cases recognized that:

first amendment rights. The court concluded she was properly discharged because she was a

confidential employee.

[T]he government interests generally asserted in support of patronage fail to justify this burden on First Amendment rights because patronage dismissals are not the least restrictive means for fostering those interests. See *Elrod, supra,* 427 U.S., at 372–373, 96 S.Ct., at 2689 (plurality opinion) and 427 U.S. at 375, 96 S.Ct., at 2690 (Stewart, J., concurring in judgment).

497 U.S. at 69, 110 S.Ct. at 2734, 111 L.Ed.2d at 63. The Supreme Court further stated that:

[C]onditioning continued public employment on an employee's having obtained support from a particular political party violates the First Amendment because of 'the coercion of belief that necessarily flows from the knowledge that one must have a sponsor in the dominant party in order *to retain* one's job.' [*Branti,*] 445 U.S., at 516, 100 S.Ct., at 1294.

497 U.S. at 71, 110 S.Ct. at 2735, 111 L.Ed.2d at 64 (emphasis added).

The Supreme Court reaffirmed that political considerations could be used when dismissing employees from policy-making positions. 497 U.S. at 71, 110 S.Ct. at 2735, 111 L.Ed.2d at 63–64, *citing Branti.* A government's primary interest in employment considerations involving employees in non-confidential/non-policy-making positions, however, lies in ensuring the effectiveness and efficiency of those employees. Political considerations are unnecessary and violative of first amendment rights when used to discharge non-policy-making employees:

A government's interest in securing effective employees can be met by discharging, demoting or transferring staff-members whose work is deficient. A government's interest in securing employees who will loyally implement its policies can be adequately served by

choosing or dismissing certain high-level employees on the basis of their political views.

497 U.S. at 74, 110 S.Ct. at 2737, 111 L.Ed.2d at 66 (*citing Elrod* and *Branti*).[3]

Importantly, the Supreme Court in *Rutan* also addressed the question of whether patronage hiring practices violate the First Amendment. The Court stated:

*What the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly.* [citations omitted] Under our sustained precedent, conditioning hiring decisions on political belief and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so. [citations omitted] We find no such government interest here, for the same reasons that we found the government lacks justification for patronage promotions, transfers or recalls.

497 U.S. at 78, 110 S.Ct. at 2738–39, 111 L.Ed.2d at 68–69 (emphasis added).

It is clear from the above-quoted language of *Rutan* that even if the West Virginia Legislature intended to codify patronage dismissals by enacting *W.Va.Code,* 7-7-7 [1982], such codification inherently violates the effected employees freedom to associate guaranteed by both the First Amendment to the *United States Constitution* and article III, section 7 of the *West Virginia Constitution.* Such a codification would force non-policy-making/non-confidential employees to inhibit their true political beliefs in order to protect and retain their government jobs. Such a forced inhibition is clearly violative of said employees freedom of speech and association.

The *Rutan* decision is consistent with the Supreme Court's earlier holding in *Branti.*

**3.** The Supreme Court went on to explain the rationale behind the *Elrod* decision:

[A]lthough the plurality recognized that preservation of the democratic process 'may in some instances justify limitations on First Amendment freedoms,' it concluded that the 'process functions as well without the practice, perhaps even better.' Patronage, it explained, 'can result in the entrenchment of

one or a few parties to the exclusion of others' and 'is a very effective impediment to the associational and speech freedoms which are essential to a meaningful system of democratic government.' *Id.,* 427 U.S. at 368–370, 96 S.Ct., at 2688.

497 U.S. at ——, 110 S.Ct. at 2734–35, 111 L.Ed.2d at 63–64.

In *Branti*, the Court addressed an argument similar to that made by the appellee in this case. The government employer therein asserted that the employees' tenure automatically expired with the term of the hiring elected official. The Supreme Court stated in footnote 6:

> [R]elying on testimony that an assistant's term in office automatically expires when the public defender's term expires, petitioner argues that we should treat this case as involving a 'failure to reappoint' rather than a dismissal and, as a result, should apply a less stringent standard. Petitioner argues that because respondents knew the system was a patronage system when they were hired, they did not have a reasonable expectation of being rehired when control of the office shifted to the Democratic Party. A similar waiver argument was rejected in *Elrod v. Burns*, 427 U.S. 347, 360, n. 13, 96 S.Ct. 2673, 2683, 49 L.Ed.2d 547; see also *id.*, at 380, 96 S.Ct. at 2692 (POWELL, J., dissenting). After *Elrod, it is clear that the lack of a reasonable expectation of continued employment is not sufficient to justify a dismissal based solely on an employee's private political beliefs.*

*Branti*, 445 U.S. 507, 512 n. 6, 100 S.Ct. 1287, 1291 n. 6, 63 L.Ed.2d 574, 580 n. 6 (emphasis added).

Other courts addressing this issue have been consistent in affirming this holding. In *Christian v. Belcher*, 888 F.2d 410 (6th Cir.1989), the Sixth Circuit Court of Appeals addressed the precise situation at issue in the instant case. In that case the governmental employers failed to reappoint a county flood plain administrator and building inspector whose employment had terminated automatically under state law. The Sixth Circuit Court of Appeals stated:

> Although in the instant case, [the employee's] employment terminated automatically under state law, such an automatic termination from otherwise continuous government employment is properly viewed as a constructive discharge in this legal context. [citations omitted] Therefore, since the case at hand is properly regarded as a 'termination' case rather than a 'hiring' case, [the government employer] was constitutionally prohibited from dismissing [the employee] solely because of his political association and/or expression.

*Id.* at 416. That same court has also held that:

> [A] failure to rehire is treated no differently than a firing under *Elrod* and *Branti*. *Branti*, 445 U.S. at 512 n. 6, 100 S.Ct. at 1291; *Christian v. Belcher*, 888 F.2d 410, 415 (6th Cir.1989). In addition, the Supreme Court has now ruled conclusively in *Rutan* that *Elrod* and *Branti* also apply to hiring decisions.

*Faughender*, 927 F.2d at 913.

Furthermore, the Eleventh Circuit Court of Appeals has addressed the issue of whether a governmental employer must retain employees who have supported a newly elected official's opponent. That court held:

> A wholesale *refusal to retain* employees who supported an opponent's election elevates political support to a job requirement. We see no practical difference between the lack of loyalty punished by [the] Sheriff ... in this case and the lack of party affiliation punished by the defendants in *Elrod* and *Branti.*

*Terry v. Cook*, 866 F.2d 373, 377 (11th Cir.1989)[4] (emphasis added).

The Fourth Circuit Court of Appeals has addressed a similar issue to the one presented in the instant case. In *Stott v. Haworth*, 916 F.2d 134 (4th Cir.1990), the Court of Appeals was faced with patronage

---

4. In *Terry* an Alabama sheriff refused to rehire or reappoint any of his predecessor's employees. The Eleventh Circuit Court of Appeals remanded the case "to permit factual development of the methods used by the remaining plaintiffs to apply for reinstatement and whether their efforts were sufficient under the circumstances." *Id.* at 378.

In this case we note that the appellants allege that they attempted to continue working. Based upon that allegation, it is clear that they intended to continue working and therefore, if their employment was to automatically terminate, they were candidates to be rehired or reappointed.

dismissals of North Carolina governmental employees *specifically exempted* from first amendment protection by an act of the North Carolina legislature. The Court of Appeals held that:

> While deference must be given to the decision to so designate those positions as exempt, or to reduce the number of exempt positions, *that decision is not unreviewable. The matter is a question of law to be ultimately decided by the courts.*

*Id.* at 142–43 (emphasis added). The Fourth Circuit Court of Appeals went on to state:

> We believe that in political patronage cases, the critical and dispositive question is whether a particular position is one that requires, as a qualification for its performance, political affiliation. If it does, then dismissal or demotion is within the bounds of the Constitution. Clearly, then, the inquiry mandated by patronage cases must go beyond the pattern or practice inquiry common to Title VII cases and must focus on individual claims with the purpose of determining (1) whether the position held was subject to patronage dismissal, and (2) if not, whether there was another constitutionally sufficient reason, such as poor job performance, constant absenteeism or insubordination, to justify the action taken. It is not until such inquiries are complete, and the answer to the posed questions is no, that a constitutional violation is implicated.

*Id.* at 143.

It is clear from the foregoing discussion of relevant case law that all courts addressing the issue of political firings have determined that codification of patronage dismissal is not dispositive of a first amendment claim by a terminated governmental employee. The dismissal is reviewable to determine whether the specific positions held by the terminated employees fall under the policy-maker/confidential employee exception articulated by the Supreme Court in *Elrod, Branti* and *Rutan.*[5]

■ It has been a longstanding rule of statutory construction in this jurisdiction that whenever and " '[w]herever an act of the Legislature can be so construed and applied as to avoid a conflict with the Constitution, and give it the force of law, such construction will be adopted by the courts.' Syllabus Point 3, *Slack v. Jacob,* 8 W.Va. 612 (1875)." Syl. pt. 1, *Perilli v. Board of Education,* 182 W.Va. 261, 387 S.E.2d 315 (1989).[6]

Therefore, we hold that the first amendment to the *United States Constitution* and article III, section 7 of the *West Virginia Constitution* do not confer any right upon a governmental employee to continued employment. Under certain circumstances, those provisions do, however, extend a protection to governmental employees to be free from employment decisions made solely for political reasons. Therefore, *W.Va.Code,* 7–7–7 [1982] may not be interpreted as permitting a governmental employer to make employment decisions based solely upon political reasons, unless the employees hold certain types of positions.

■ The mischief to be protected against in this case or similar cases is not the termination of an employee, by itself, but whether the termination was solely based upon political reasons. Nothing in this opinion should be construed as giving a governmental employee a *right* to any job. We merely acknowledge that the West Virginia Legislature, except for certain positions, may not permit, directly or indirectly,

---

5. We note that the great majority of cases addressing the termination of employment of governmental employees for alleged patronage or political reasons, including those holding jobs in state or local government, have been brought in the federal court system. Perhaps there is a reluctance to put faith in state court systems to protect the *federal* constitutional rights of those persons. We want to make clear that we recognize our duty and we will not abrogate from our responsibility to review and apply the *United States Constitution* when a provision of the *West Virginia Code* presents an inconsistency with the *Constitution.*

6. The rule articulated in *Slack* and *Perilli* is equally applicable to acts of the legislature that conflict with either the *United States Constitution* or the *West Virginia Constitution.*

employment decisions based solely upon political reasons. As the Supreme Court stated in *Rutan:*

> The First Amendment is not a tenure provision, protecting public employees from actual or constructive discharge. The First Amendment prevents the government, except in the most compelling circumstances from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate.

*Rutan*, 497 U.S. 62, 76, 110 S.Ct. 2729, 2738, 111 L.Ed.2d 52, 67.

■ This case must therefore be remanded to consider the question of whether these appellants were terminated (constructively or explicitly) solely for political reasons. Only if that question is answered in the affirmative must an inquiry be made into the nature of the employment of the position held: whether the position falls within the policymaker/confidential exception. To withstand a motion to dismiss based upon their complaint, it is enough for the appellants to allege that they have been terminated from otherwise continuous government employment solely for political reasons.

For the reasons stated above, the order of the Circuit Court of Boone County is reversed, and this case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

NEELY, J., dissents with opinion.

NEELY, Justice, dissenting:

When the average voter takes a beating from government, he does not take it from a president, governor, sheriff or assessor. The average voter takes his abuse, enjoys his frustration, and suffers his measure of needless incompetence at the hands of low grade postal clerks, bureaucrats in the department of motor vehicles, and arrogant cops. In yesteryear, the average voter—a person unable to make political campaign contributions, unable to entertain lavishly, and unable even to flatter convincingly—had at least one weapon in his never ending battle with government—his vote! *Elrod v. Burns*, and its progeny *Branti* and *Rutan*, changed all that.

It is not the prerogatives of elected officials that are at stake in this case, but rather the value of the working class vote. Every West Virginian knows that the will and pleasure staffs of county clerks, county assessors, circuit clerks, and sheriffs render competent, efficient and courteous service seldom, if ever, duplicated at the state or federal levels. This is because of one thing: ACCOUNTABILITY. When a county officeholder loses an election, everyone who works for him loses office, so local staffs have a profound personal interest in competent, efficient and courteous service. Will and pleasure staff work hard to make their bosses look good so that their bosses will keep their jobs and the staff will keep theirs.

Voter participation in the United States is among the lowest in the world,[1] and for good reason. When, for all intents and purposes, we have a permanent government because of civil service and *Elrod v. Burns*, voting in the United States is as useless as voting in post-Tianamen Square Communist China. Furthermore, the working class should be out in the streets over today's decision because it deprives the ordinary wage earner of the one and only bargaining chip he or she has in negotiations with the government—his or her vote.[2]

---

1. Wolfinger, "Voter Turnout," *Society*, July–Aug. 1991, at 24. The 1990 midterm elections had a non-surprising low voter turnout; indeed, only 36 percent of those eligible across the nation voted. *America*, November 24, 1990, at 388. *See Statistical Abstract of the United States 1991* (111th Ed.), Chart Nos. 450, 451, and 454.

2. In Los Angeles, California, the representatives of six poor districts containing more than 1.4 million people are elected by a total of some 37,000 voters. Los Angeles' most prominent Latino elected official is Gloria Molina, who is county supervisor and responsible for one-fifth of Los Angeles County, containing 1.77 million people. Ms. Molina was elected by 45,805 voters—roughly the same proportion of voters as in the districts. These numbers suggest that the failure of civil authority in the Los Angeles riot of 1992 was preceded by a classic failure of

The wealthy classes—particularly those in commerce, industry and the professions who do business with the government—are amply represented in the political process because they have money, and in a society without effective political parties that evaluate and manage government, politicians have become simple commodities to be flogged on the television like soap or toothpaste. MONEY and MORE MONEY are now the only requirements for winning elections. Already in the 1992 California general election campaign that is progressing at the time this case is being decided, it has been discovered that the *only* occasions on which the candidates for the United States Senate appear in public are at fund-raising events! Such a phenomenon clearly signals that *only people with money count in politics*, and today's decision goes one further step toward carving that vicious maxim in stone.

I am sympathetic towards government employees who lose their jobs. Indeed, such governmental employees have every bit as much difficulty finding new jobs as unemployed coal miners, laid-off factory workers, and redundant railroad firemen. But just as the anxiety of regularly looking for work is the cost of a high-efficiency,

flexible free enterprise private sector, the anxiety of looking for work is the cost of a responsive state and local government. *Elrod v. Burns* was a mistake and the U.S. Supreme Court will soon erode it.[3] However, in the meantime, today's majority opinion is not mandated by either the letter or the direction of the law[4] and, therefore, we should stand up in this case and be counted as favoring an accountable government.

It will be a travesty if this case is not appealed to the Supreme Court of the United States so that a new majority may undo, at least partially, the ineffable damage and destruction that followed in the wake of *Elrod*.

I.

Although the U.S. Supreme Court has used sweeping generalities in *obiter dicta* surrounding its holdings in the area of patronage job action, the actual effect of the decisions has been to leave substantial discretion to the state legislature. In *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the U.S. Supreme Court held only that one could not be dismissed from a job *in which one had an expectancy to re-*

democratic institutions, the most prominent of which is total loss of control by working class voters of any of the engines of government. In Los Angeles, the local political system is an unworkable relic of the progressive era. The city government was conceived in the 1930's, and the system provides a "managerial government" with a weak mayor and a city council that has both legislative and executive power. The political parties are excluded from local elections. The result is a society that produced in two days' civil strife in 1992 (in response to the acquittal of white policemen in a police brutality case) 58 deaths, 2,383 injuries, 5,383 fires, 16,291 arrests and $785 million worth of damage. If the people had a real vote instead of a suppositious one, none of this would have occurred and Los Angeles would be a much more liveable city. *See* T. Rutten, "A New Kind of Riot," *The New York Review*, 11 June 1992.

3. Note that of the five U.S. Supreme Court justices who voted for *Rutan* (Brennan, Marshall, White, Stevens and Blackmun, JJ.), two are no longer on the Court. Note further that the four dissenters (Scalia, O'Connor, Kennedy, JJ., and Rehnquist, C.J.) all joined in the following vowing to overrule the sweeping nature of *Rutan:*

Even in the field of constitutional adjudication, where the pull of *stare decisis* is at its weakest, see *Gliden Co. v. Zdanok*, 370 U.S. 530, 543, 82 S.Ct. 1459, 1469, 8 L.Ed.2d 671 (1962) (opinion of Harlan, J.), one is reluctant to depart from precedent. But when that precedent is not only wrong, not only recent, *not only contradicted by a long prior tradition*, but also has proved unworkable in practice, then all reluctance ought to disappear. In my view that this is the situation here. Though unwilling to leave it to the political process to draw the line between desirable and undesirable patronage, the Court has neither been prepared to rule that no such line exists (i.e., that *all* patronage is unconstitutional) nor able to design the line itself in a manner that judges, lawyers, and public employees can understand.

4. The majority paints this area of the law as clearly defined and settled based on dicta in *Rutan* and the holdings of three federal circuit courts (*see supra* slip op. at 687–688); however, the majority's assumption is misleading and inaccurate. The law is not settled (*see infra* part I).

*main* because of political affiliation. These holdings left it up to the legislatures to create jobs with such expectancies or to create jobs with no such expectancies.[5]

At the same time that the U.S. Supreme Court was expanding the reach of judicial scrutiny over government employment decisions the Court was also expanding the number of employees who would be exempt from that scrutiny. In *Elrod*, the U.S. Supreme Court allowed patronage dismissals of only "policy-making" or "confidential" employees. 427 U.S. at 367, 96 S.Ct. at 2686–87 (plurality opinion); *id.* at 375, 96 S.Ct. at 2690 (Stewart, J. concurring). Later, in *Branti* and *Rutan*, the test was broadened to "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518, 100 S.Ct. at 1295; *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 2734, 111 L.Ed.2d 52 (1990). The *Elrod–Branti–Rutan* test involves "striking a balance between the interests of the [government employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977) (quoting *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968)); *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983).

When this balancing has been performed by the legislature, and the executive acts in accord with a specific statute, the courts have granted "a wide degree of deference to the employer's judgment" that the employee's speech will interfere with close working relationships. *Connick v. Myers*, 461 U.S. at 152, 103 S.Ct. at 1692. Therefore, "[a] governmental employer may subject its employees to such special restrictions on free expression as are reasonably

necessary to promote effective government." *Brown v. Glines*, 444 U.S. 348, 356 n. 13, 100 S.Ct. 594, 601 n. 13, 62 L.Ed.2d 540 (1980). Such a restriction need not be the least restrictive means to reach the goal; it is not necessary that "the act regulated be anything more than an act reasonably deemed by [the legislature] to interfere with the efficiency of the public service." *Public Workers v. Mitchell*, 330 U.S. 75, 101, 67 S.Ct. 556, 570, 91 L.Ed. 754 (1947). Courts are not "in any position to dispute" the judgment of the legislature, so long as they have a "rational connection" to the governmental objective. *CSC v. Letter Carriers*, 413 U.S. 548, 567, 93 S.Ct. 2880, 2891, 37 L.Ed.2d 796 (1973); *Kelley v. Johnson*, 425 U.S. 238, 247, 96 S.Ct. 1440, 1445–46, 47 L.Ed.2d 708 (1976). Certainly creating anxiety among low level appointees at the local level that if the office performs badly and the elected official loses his job, they're all out is a legitimate legislative decision.

The U.S. Supreme Court has long acknowledged that "government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. at 143, 103 S.Ct. at 1688; *Perry v. Sindermann*, 408 U.S. 593, 598, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972); *Mount Healthy City Board of Ed.*, 429 U.S. at 284, 97 S.Ct. at 574–75; *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 414, 99 S.Ct. 693, 695–96, 58 L.Ed.2d 619 (1979). When a balancing of interests is called for, and the legislature has (in a legitimate exercise of its authority) made that balancing decision, the courts should not interfere.

A quick survey of the progeny of *Elrod*, *Branti*, and *Rutan* shows the importance of this deference. Applying the balancing test, lower federal courts have determined that many essentially equivalent positions have different constitutional protections:

> [A]ll circuit court decisions—and almost all other court decisions—involving attorneys in government service, other than public defenders, have held that *El-*

---

**5.** In *W.Va.Code*, 7–7–7 [1982], the West Virginia Legislature chose explicitly to create jobs which

terminate upon the expiration of the previous sheriff's term.

*rod/Branti* do not protect those positions. Nevertheless, the United States District Courts for the Western District of New York and the Northern District of New York have held, respectively, that an assistant county attorney in family court [*Tavano v. County of Niagara*, 621 F.Supp. 345, 349–50 (W.D.N.Y. 1985)], and an attorney for the department of social services [*Layden v. Costello*, 517 F.Supp. 860 (N.D.N.Y.1985)] are protected from patronage dismissals under *Elrod/Branti.* Moreover, in contrast to the Seventh Circuit's decision that, in carrying out one's duties, an assistant state attorney may make some decisions that will actually create policy [*Livas v. Petka*, 711 F.2d 798, 801 (7th Cir.1983)], the District Court for the Western District of New York held that an assistant county attorney is not a policy maker even though the position entails considerable latitude in handling caseloads, little day-to-day supervision, and no guidelines as to case management. [*Tavano*, 621 F.Supp., at 349]. Martin, *A Decade of Branti Decisions: A Government Official's Guide to Patronage Dismissals*, 39 Am.U.L.Rev. 11, 46–47 (1989). This problem is not just limited to attorneys:

> A city cannot discharge its deputy court clerk for his affiliation, but it can fire its legal assistant to the clerk on that basis. Firing a juvenile court bailiff seems impermissible, but it may be permissible if he is assigned permanently to a single judge. A city cannot fire on partisan grounds its director of roads, but it can fire the second in command of the water department. A government cannot discharge for political reasons the senior vice president of its development bank, but it can discharge the regional director of its rural housing administration. [Citations omitted]

*Rutan*, 497 U.S. at 111, 110 S.Ct. at 2757 (Scalia, J. dissenting).

Perhaps most relevant to the case before us, courts have dealt inconsistently with the susceptibility of assistants to sheriffs to patronage-based job actions. A city cannot fire a deputy due to his political affiliation. *Jones v. Dodson*, 727 F.2d 1329, 1338 (4th Cir.1984); *Elrod v. Burns, supra.* On the other hand, other courts have ruled that deputy sheriffs may be fired due to their politics. *McBee v. Jim Hogg County, Texas*, 730 F.2d 1009, 1014–15 (5th Cir. 1984) (*en banc*). Similarly, if the deputy sheriff position happens to be entitled "police captain", then he may be dismissed due to his political affiliation. *Joyner v. Lancaster*, 553 F.Supp. 809, 818 (M.D.N.C. 1982), later proceeding 815 F.2d 20, 24 (4th Cir.), *cert. denied*, 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 62 (1987). When courts, on an *ad hoc* basis apply the *Elrod–Branti–Rutan* balancing test, no consistent result emerges.

However, there is a dire need for a consistent definition of the jobs that are protected by the coverage of *Elrod, Branti*, and *Rutan.* One of the primary policies behind these cases is that politically-based employment decisions have a chilling effect on the public employees who would otherwise exercise their First Amendment Rights. However, as Judge Weinstein points out, that chilling effect is more than doubled by the lack of a bright-line rule:

> This restraint is unnecessarily magnified when public employees remain in doubt as to which positions are subject to the protection of the First Amendment and which are not. Similarly, lack of notice as to the scope of First Amendment protection of public employees hinders elected officials seeking to exercise their legitimate powers through the control of personnel.

*Ecker v. Cohalan*, 542 F.Supp. 896, 901 (E.D.N.Y.1982). Without a bright-line rule, people do not know whether their jobs are protected and thus are inhibited from risking dismissal. Meanwhile employers are likely to play it safe and not risk firing a politically uncongenial employee, because an incorrect guess could lead to lengthy and potentially damaging litigation.[6]

---

**6.** Another argument in support of the *Elrod–Branti–Rutan* line of cases is that by eliminating patronage as a consideration for its hiring, an elected official will somehow be better able to

Indeed, in other contexts, the U.S. Supreme Court has noted that a chilling effect on public officials which prevents them from effectively discharging their duties should be avoided:

> [O]fficials are subject to a plethora of rules, "often so voluminous, ambiguous, and contradictory, and in such flux that officials can only comply with or enforce them selectively." ... In these circumstances, officials should not err always on the side of caution. "[O]fficials with a broad range of duties and authority must often act swiftly and firmly at the risk that action deferred with be futile or constitute virtual abdication of office."

*Davis v. Scherer*, 468 U.S. 183, 195–96, 104 S.Ct. 3012, 3019–20, 82 L.Ed.2d 139 (1984) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 246, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90 (1976)). The contradictory nature of the seeming myriad of bureaucratic rules has an especially chilling effect on the performance of a newly-elected official who has just ousted an incumbent and is ready to implement his electoral mandate. Accordingly, we should work to create clear bright-line rules wherever possible to permit officials most effectively to carry out their assigned duties.

In a sense, a bright-line rule exists on one side; when the legislature has clearly expressed its preference for civil service protection of an employee, that protection guarantees employee freedom from patronage employment decisions. However, it is just as clear that the legislature needs the ability clearly to define the other set of jobs; i.e., those that are subject to patronage employment decisions. The separation of powers requires that courts should grant deference to executive action when it is supported by a validly enacted statute. That requirement must work both ways.

The U.S. Supreme Court has developed a framework by which legislatures can create bright-line definitions of protected and unprotected jobs. By fitting the cases into this framework, a more consistent view of the cases emerges. Better still, by employing this framework, we are able adequately to protect employees' rights while avoiding making every employment decision a constitutional issue.

## II.

The U.S. Supreme Court has long held that the level of scrutiny to be applied during judicial review of executive action varies with the legislative support for that action.[7] Justice Jackson, in his famous concurrence in *Youngstown Sheet & Tube Co. v. Sawyer* (the *Steel Seizure Case*), outlined this relationship:

> 1. *When the President acts pursuant to an express or implied authoriza-*

---

implement his electoral mandate. *Elrod*, 427 U.S., at 367, 96 S.Ct. at 2686–87 (plurality opinion). Yet that elected official will be "chilled" from terminating obstructionist employees for fear of a lawsuit. As Susan Lorde Martin wrote in *A Decade of Branti Decisions: A Government Official's Guide to Patronage Dismissals:*

> Thus, a newly elected official wanting to employ his or her supporters may face a lawsuit if the official attempts to replace any outgoing party employee other than the most high-ranking policymakers or confidants. Few deterrents exist to dissuade a disgruntled former employee affiliated with the opposition party from filing a section 1983 suit alleging an unconstitutional patronage dismissal. Furthermore, even if a court eventually vindicates the official's decision to dismiss, the legal costs to the public and the disruptions to the government may still be considerable.

39 Am.U.L.Rev. 11, 47–48 (1989). Because we do not want every government employment decision to turn into a constitutional lawsuit, we must allow the legislature to create rational bright-line rules.

7. Justice Jackson eloquently described that relationship in his concurrence in the *Steel Seizure Case:*

> The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness, but interdependence, autonomy but reciprocity. Presidential powers are not fixed but fluctuate, depending on their disjunction or conjunction with those of Congress.

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

*tion of Congress, his authority is at its maximum,* for it includes all that he possesses in his own right plus all that Congress can delegate. In these circumstances, and in these only, may he be said (for what it may be worth) to personify the federal sovereignty. If his act is held unconstitutional under these circumstances, it usually means that the Federal Government as an undivided whole lacks power. A seizure executed by the President pursuant to an Act of Congress *would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.*

2. *When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain.* Therefore, congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility. *In this area, any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law.*

3. *When the President takes measures incompatible with the express or implied will of Congress, his power is at its lowest ebb,* for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject. *Presidential claim to a power at once so conclusive and preclusive must be scrutinized*

*with caution, for what is at stake is the equilibrium established by our constitutional system.* [Footnotes omitted; emphasis added]

343 U.S. at 635–638, 72 S.Ct. at 870–72 (Jackson, J., concurring). While Justice Jackson was describing the federal situation, the separation of powers analysis is equally valid when the relationship in question is between any state executive officer (whether governor or sheriff) and his state legislature.

### A.

When viewed in this light, we can begin to bring order to the apparent chaos of prior decisions.[8] In *Rutan*, the Illinois legislature had enacted a civil-service scheme into law. When Governor Thompson was elected, he single-handedly "issued an executive order proclaiming a hiring freeze for every agency, bureau, board, or commission subject to his control." *Rutan*, 497 U.S. at 65, 110 S.Ct. at 2732. This executive order prohibited all job actions without the Governor's express permission.[9] Permission was routinely forthcoming for those with Republican "sponsors," but routinely denied to those without such support. This system was imposed *in direct violation* of the state's civil service statutes.

As Justice Stevens noted in his *Rutan* concurrence, "The question in this case is simply *whether a Governor may adopt a rule that would be plainly unconstitutional if enacted by the General Assembly of Illinois.* [Footnote omitted; emphasis added]" *Rutan*, 497 U.S. at 81, 110 S.Ct. at 2740 (Steven, J., concurring). Because the executive took measures that were clearly incompatible with the express will of the legislature, this placed the action in Justice Jackson's category 3; where "his power is

---

8. *See supra* p. 686 and accompanying text.

9. The extent of this prohibition was absolute. Governor Thompson denied a promotion of a rehabilitation counselor, denied a promotion to a road equipment operator, failed to hire a prison guard, failed to recall a state garage worker from a layoff, and failed to recall a dietary manager with the health department from a layoff. All of those adverse job actions were due to the employees' lack of Republican "sponsorship." These five became the plaintiffs in *Rutan*.

at its lowest ebb." [10]    The U.S. Supreme Court accordingly scrutinized the Governor's conduct "with caution, for what is at stake is the equilibrium established by our constitutional system." [11]

### B.

Not every executive who has made a hiring decision based in part on political affiliation acts in direct contradiction of legislative mandate. More often than not, such an executive acts in "the zone of twilight" where he and the legislature "have concurrent authority, or in which its distribution is uncertain." [12] Such an example is *Stott v. Haworth*, 916 F.2d 134 (4th Cir.1990).[13] In *Stott*, the newly-elected Governor Martin sought to eliminate the jobs of many of the employees who were previously classified as "exempt" from civil service protection.[14] The North Carolina civil service statute gave the governor a broad grant of authority to define positions as "exempt." Governor Hunt, Governor Martin's predecessor, liberally used that power to create a large number of exempt positions.

While not clearly in violation of the statute, Governor Hunt's appointments were apparently in the "zone of twilight" between clear compliance with the civil-service statute and an obvious violation of it:

> Before us is a situation where Governor Martin was attempting to bring the North Carolina employment scheme into conformity with the civil employee statute by cutting down on the number of exempt positions extant in North Carolina. Unfortunately, *Governor Martin was faced with the task of trimming exempt positions that under the statute most likely should never have been so designated.* This we find to be bipartisan decision and not a decision based on the governor's affiliation to the Republican Party. [Emphasis added]

*Stott*, 916 F.2d at 142 n. 11.[15] Under Justice Jackson's framework in the *Steel Seizure Case*, the appropriate standard of review is "any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of the law." In other words, where the authority of the executive has unclear support from the legislature, the courts should evaluate each event on a case-by-case basis. Sure enough, the Fourth Circuit remanded the case to the district court because resolution of such a claim "requires a district court to do a case by case, position by position, activity by activity analysis of the First Amendment questions raised by the pleadings." *Stott*, 916 F.2d at 145.

### C.

However, the case before us is neither Justice Jackson's situation 2 nor situation

---

**10.** *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. at 637–638, 72 S.Ct. at 870–71 (Jackson, J., concurring).

**11.** *Id.*

**12.** This is Justice Jackson's category 2. *Youngstown Sheet & Tube*, 343 U.S. at 637, 72 S.Ct. at 870 (Jackson, J., concurring opinion).

**13.** *Branti v. Finkel, supra*, is another such case. In *Branti*, the employees were hired by the public defender's office "at will." There was no clear statutory definition of the term of office. Accordingly, the actions of Branti, the public defender, were appropriately examined on a case-by-case, fact specific basis.
The majority's reliance on footnote 6 of *Branti* is a mere red herring. What the footnote says is that the testimony that the employees had a subjective expectancy that they would be terminated is not enough to avoid a fact-based examination of the conduct of the executive.

Such is not the case here. What is at issue here is the fact that the executive, when acting in a clear, direct concordance with a statute, is given a different level of scrutiny because of that fact. The "expectancy" language of *Branti* is irrelevant. What is at issue is much more fundamental: separation of powers. *See, infra* parts II.C. and II.D.

**14.** As a campaign promise, Gov. Martin had promised to significantly cut the number of exempt positions in his administration from the 1,500 in the previous Governor's administration. *Stott*, 916 F.2d at 138–139.

**15.** The majority cites *Stott* for a clearly incorrect proposition. The majority claims that the North Carolina legislature *"specifically exempted* [emphasis original]" those positions from First Amendment protection. *See supra* pp. at 687–688. As can be seen from footnote 11 of *Stott*, such is obviously not the case.

3. This is the first situation: the executive is acting under the express authority of a statute, namely *W.Va.Code*, 7–7–7 [1982]. Therefore, under the framework, the sheriff's "authority is at a maximum" and should be "supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Youngstown Sheet & Tube*, 343 U.S. at 635–637, 72 S.Ct. at 870–71 (Jackson, J., concurring).[16]

The U.S. Supreme Court has consistently followed this approach in examining instances where the government, as an employer (as opposed to a regulator), has placed limits on constitutional guarantees:

Private citizens perhaps cannot be prevented from wearing long hair, but policemen can. *Kelley v. Johnson*, 425 U.S. 238, 247, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976). Private citizens cannot have their property searched without probable cause, but government employees can. *O'Connor v. Ortega*, 480 U.S. 709, 723, 107 S.Ct. 1492, 1501, 94 L.Ed.2d 714 (1987) (plurality opinion); *id.*, at 732, 107 S.Ct., at 1506 (SCALIA, J. concurring in judgment). Private citizens cannot be punished for refusing to provide the government information that may incriminate them, but government employees can be dismissed when the incriminating information that they refuse to provide relates to the performance of their job. *Gardner v. Broderick*, 392 U.S. 273, 277–278, 88 S.Ct. 1913, 1915–1916, 20 L.Ed.2d 1082 (1968). *With regard to freedom of speech in particular:* Private citizens cannot be punished for speech of merely private concern, but government employees can be fired for that reason. *Connick v. Meyers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). Private citizens cannot be punished for partisan political activity, but federal and state employees can be dismissed and otherwise punished for that reason. *Public Workers v.*

*Mitchell*, 330 U.S. 75, 101, 67 S.Ct. 556, 570, 91 L.Ed. 754 (1947); *CSC v. Letter Carriers*, 413 U.S. 548, 556, 93 S.Ct. 2880, 2886, 37 L.Ed.2d 796 (1973); *Broadrick v. Oklahoma*, 413 U.S. 601, 616–617, 93 S.Ct. 2908, 2918–2919, 37 L.Ed.2d 830 (1973). [Emphasis added]

*Rutan*, 497 U.S. at 94–95, 110 S.Ct. at 2747–2748 (Scalia, J., dissenting). The U.S. Supreme Court has been deferential to such limitations on liberty because they are supported by force of clear and direct legislative authority.

The proper standard by which to evaluate government-as-employer conduct is that the government may not act in a manner that is "patently arbitrary or discriminatory." *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961). Indeed, the U.S. Supreme Court has held that when regulating the First Amendment rights of government employees, the legislature need not employ the least restrictive means available, but that courts are not "in any position to dispute" the judgment of the legislature, so long as they have a "rational connection" to the governmental objective. *CSC v. Letter Carriers*, 413 U.S. at 567, 93 S.Ct. at 2891; *Kelley v. Johnson*, 425 U.S. 238, 247, 96 S.Ct. 1440, 1447, 47 L.Ed.2d 708 (1976).

In sum, the U.S. Supreme Court jurisprudence has established a clear set of principles by which to analyze a patronage employment decision case. If the executive acts contrary to express legislative authority, then his conduct is subject to strict scrutiny. If the executive acts in the "zone of twilight" of unclear legislative action, then the courts must examine the executive's action on a case-by-case basis. However, when the executive acts with the express authorization of a valid statute which is rationally connected to its end, the courts as a matter of law should defer to the

---

**16.** When we talk about express legislative authority, that legislation must, of course, be constitutionally valid. For example, a valid statute could not say, "The Governor of West Virginia may not hire any male WASPs (i.e., white Anglo–Saxon protestants) under 40," as it would violate the Fourteenth Amendment.

legislative resolution of the balancing of interests.

### D.

A thorough examination of the *West Virginia Code* shows that the Legislature has developed a comprehensive scheme of civil service. The Legislature had a particular purpose in mind when it created the civil service:

> The general purpose of this article is to attract to the service of this state personnel of the highest ability and integrity by the establishment of a system of personnel administration based on merit principles and scientific methods governing the appointment, promotion, transfer, layoff, removal, discipline, classification, compensation and welfare of its civil employees, and other incidents of state employment. All appointments and promotions to positions in the classified service shall be made solely on the basis of merit and fitness, *except as hereinafter specified.* [Emphasis added]

**17.** Deputy sheriffs are defined as those sheriff's deputies whose duties consist of active, general law enforcement. *W.Va.Code,* 7–14–2 [1971]. Tax deputies, such as appellants, are not covered by deputy sheriff civil service, and are, therefore, covered by the provisions of *W.Va. Code,* 7–7–7 [1982].

**18.** *W.Va.Code,* 7–14–1 [1991] now reads:

> Notwithstanding the provisions of article three [§ 6–3–1 et seq.], chapter six and article seven [§ 7–7–1 et seq.], chapter seven of this code, all appointments and promotions of full-time deputy sheriffs shall be made only according to qualifications and fitness to be ascertained by examinations, which, so far as practicable, shall be competitive, as hereinafter provided. On and after the effective date of this article, no person except the chief deputy shall be appointed, promoted, reinstated, removed, discharged, suspended or reduced in rank or pay as a full-time deputy sheriff, as defined in section two [§ 7–14–2], of any county in the state of West Virginia subject to the provisions hereof, in any manner or by any means other than those prescribed in this article.

In this section, the legislature has clearly delineated that all deputy sheriffs, except the chief deputy, are covered by civil service. Furthermore, the legislature has also clearly delineated that the chief deputy is not entitled to such protection. The Legislature has performed the balancing tests for the courts. Assuming the

*W.Va.Code,* 29–6–1 [1977]. In general, the government has provided civil service protection for most of its employees. However, the Legislature has carefully carved out exceptions from the general scheme of civil service where it has concluded that party affiliation is an "appropriate requirement for the effective performance of the public office involved." *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295; *Rutan,* 497 U.S. at 169–70, 110 S.Ct. at 2734.

Indeed, the Legislature has been active in evaluating which employees in the sheriff's department should be covered by civil service. In 1991, the Legislature amended *W.Va.Code,* 7–14–1 to include all deputy sheriffs [17] (except chief deputies) in the civil service program.[18] Other sheriff's employees (as defined in *W.Va.Code,* 7–7–7) are explicitly not granted civil service status; appellants were such employees. Furthermore, their terms explicitly end when the term of the sheriff who hires them ends.[19] The Legislature has enacted a val-

executive acts in accordance with the statute, then all we need to do is apply that legislative judgment as a matter of law; fact based inquiries to determine whether a chief deputy sheriff is a patronage-susceptible employee are no longer necessary.

I note that the majority ignored the amendment to *W.Va.Code,* 7–14–1 [1991].

**19.** I do not accept Appellant's argument that these employees had an interest in their jobs past the statutory expiration of their terms. The language in *State ex rel. Dingess v. Scaggs,* 156 W.Va. 588, 592, 195 S.E.2d 724, 727 (1973) that if the newly elected sheriff does not have his new deputies and assistants all approved by the first day of his term "the deputies and assistants of the former sheriff are permitted by law to hold over," *does not* create an expectancy interest for the employees of the old sheriff any more than a tenant's "right" to hold over after the end of a lease gives that tenant an expectancy to continue to occupy the premises. All the "hold over" language means is that if a new slate of assistants is not ready to go on January 1, the previous ones may fill the slots *until new appointees are ready to serve.* In this case, new appointees were working on the first day of the new term. Even if they had not been, the previous sheriff's employees would only have had an interest in working until replacements were hired. Thus, the appellants had no interest in the job after the term of the sheriff under whom they served.

id, explicit statute which is "rationally connected" to the end of giving an elected sheriff discretion in who he hires as his direct subordinates.[20]

If under the tests of *Elrod, Branti,* and *Rutan* a balancing of interests is to be performed, and the executive's action has been in accordance with an explicit statute which has resolved that balancing of interests, then we should defer to that legislative decision. In such a case, neither we nor the circuit court needs to make a specific factual inquiry into the circumstances surrounding the alleged patronage job action; for the legislature has performed the balancing for us, and has enunciated a clear standard for everyone to follow.

In this case, the sheriff refused to keep in his employ assistants whose jobs terminated by statute before he took office. This action was taken with the support of an explicit statute, *W. Va. Code,* 7–7–7 [1982]. This is a valid statute which is rationally connected to its purpose of providing a local sheriff with the right to hire a loyal personal staff.

---

**20.** A local sheriff's office is small, and the performance of each individual directly reflects on the sheriff's standing in the community. The important decisions are made by the second- and third-echelon employees, and the legislature has clearly stated that a sheriff deserves a free hand in appointing those assistants who perform on his behalf. The legislature has performed the balancing test on its own and determined that it is "appropriate" for a sheriff to be able to install his own people, taking political party into account if he should so choose. *See Savage v. Gorski,* 850 F.2d 64, 68 (2nd Cir.1988)

(noting an exception from constitutional protection for a position where "there is a rational connection between shared ideology and job performance"); *Horn v. Kean,* 796 F.2d 668, 681 (3rd Cir.1986) (*en banc*) (plurality opinion) (holding that constitutional protection does not protect against patronage dismissal of state motor vehicle agents because the judiciary "has an obligation to respect political choices"); *Meeks v. Grimes,* 779 F.2d 417, 422 (7th Cir.1985) (holding that the First Amendment does not require governmental officials to work in constant contact with their political enemies).