396 S.E.2d 160

**Florence NEELY**

v.

**R. Michael MANGUM, Sheriff of Raleigh County.**

**No. 19369.**

Supreme Court of Appeals of West Virginia.

July 11, 1990.

W.A. Thornhill, III, Beckley, for Florence Neely.

Daniel R. Schuda, Steptoe & Johnson, Charleston, for R. Michael Mangum.

WORKMAN, Justice:

This is an appeal from a directed verdict in favor of the appellee, R. Michael Mangum, the Sheriff of Raleigh County (hereinafter referred to as Sheriff), in a wrongful discharge suit initiated by the appellant, Florence Neely. In addition to her claim that the court erred in granting a directed verdict in the Sheriff's favor, Mrs. Neely also maintains that she was wrongfully suspended for nine months prior to her discharge. Having reviewed the record in this matter, we conclude that the court did not err in ruling that the Sheriff had the right to suspend Mrs. Neely, and that the granting of a directed verdict was proper because Mrs. Neely failed to prove by a preponderance of the evidence that her discharge resulted from political discrimination.

Mrs. Neely went to work for the Raleigh County Sheriff's Department in 1968 as an employee in the tax department. Her position was not a civil service position when she was hired and is not a civil service position today. As the senior person in the department when the chief tax deputy retired in 1976, Mrs. Neely was promoted to the chief tax deputy position.

Sheriff Mangum was one of several individuals who sought the Democratic nomination for sheriff in the May 1984 primary election. Mrs. Neely was not a supporter of Mr. Mangum in the primary election. Following his success in the general election in November 1984, Sheriff-elect Mangum told Mrs. Neely that he did not want his office to be located in the area of the law enforcement division of the Sheriff's department.[1] He advised Mrs. Neely that he intended to use the office which she previously occupied as the chief tax deputy. Sheriff Mangum also informed Mrs. Neely that he intended to appoint a new chief tax deputy and consequently, that he would be changing her position and reducing her salary.

When Sheriff Mangum took office on January 1, 1985, he did not fire any of the employees who had worked in the department prior to his election. Mrs. Neely spent the month of January working on the sheriff's settlement, which involved balancing checks and receipt books from the prior administration. After she completed this work, Sheriff Mangum assigned Mrs. Neely to the automobile license bureau of the Sheriff's department. Her salary was reduced by more than nine thousand dollars in connection with the demotion. Mrs. Neely's successor as chief tax deputy, however, also took her position at a reduced salary compared to the amount previously paid to Mrs. Neely.[2]

In May 1985, Mrs. Neely was indicted by a special Raleigh County grand jury for altering public documents in connection with back-dating a tax ticket. The parties concur that the practice of placing the actual date of the receipt of the tax payment from the taxpayer on the tax ticket rather than the date that the tax office employees processed the paperwork was a common and accepted practice. This was necessary, according to tax office employees, because of the difficulty in locating necessary paperwork and the rush of business at certain times of the month or year. Mrs. Neely was indicted for back-dating a tax ticket several months, to a date approximately nine months before the receipt of the tax payment and a date before any penalties became applicable.[3] On the same day the indictment was returned, Sheriff Mangum suspended Mrs. Neely from her job.

Sheriff Mangum testified that on July 12, 1985, while Mrs. Neely was on suspension, he received information from an informant that Mrs. Neely had been alerting her sons when undercover narcotics officers obtained cash from the petty cash box to make drug buys. As chief tax deputy, Mrs. Neely was in possession of the department's petty cash box. Sheriff Mangum did not take any further action with respect to Mrs. Neely's employment upon receiving this information. He did advise her, by letter dated September 27, 1985, that he had "substantial evidence" that she had "interfered with investigations relating to the sale, purchase or use of controlled substances." He further stated in this same letter that "it is my duty to investigate the grounds for the issuance of such indictments and to make my decision as to your

1. Sheriff Mangum testified that his reason for not wanting his office to be within the confines of the law enforcement division of the Sheriff's department was his desire to secure privacy when conferring with law enforcement personnel conducting investigations or individuals having complaints against the Sheriff's law enforcement personnel.

2. Vanessa Kirk, Mrs. Neely's successor as chief tax deputy, took the position at an annual salary of $15,300. When Mrs. Neely held this position, she was paid more than $23,000 per year.

3. Mrs. Neely testified that although the tax payment in question was actually made in May 1981, she dated the receipt to indicate that the payment was made in August 1980. By doing this, the taxpayer received the benefit of not paying any interest on a $23,511.00 tax bill.

continued employment based upon all credible information I may have regarding your fitness for your position."

In September 1985, Sheriff Mangum discovered that a microwave oven had been purchased in 1983 by the tax office but billed to the county commission as a file cabinet. He directed a law enforcement deputy to investigate this matter and concluded that the purchase had been made by Mrs. Neely because her initials were affixed to a 1983 purchase order and receipt for a file cabinet. He reported this information to the prosecuting attorney of Raleigh County and was later called before a grand jury to testify regarding this matter. The grand jury failed to return an indictment and Sheriff Mangum was asked to appear before a second grand jury in January 1986. When a second grand jury was presented with evidence regarding the microwave purchase, an indictment charging Mrs. Neely with falsification of records was returned.

By letter dated February 11, 1986, Sheriff Mangum informed Mrs. Neely that she was terminated, effective February 26, 1986. Sheriff Mangum referenced the indictments which involved the back-dated tax ticket and the microwave purchase as grounds for the termination. Referring to the microwave indictment, the Sheriff's letter stated that "[t]his additional count of falsifying accounts forces me to conclude that you have engaged in substantial misconduct in your official capacity, necessitating your termination." He further advised Mrs. Neely that, "[i]f you desire specific details in support of this decision, in addition to the grounds set forth by indictment, ..." he would provide such information upon request.

The special prosecutor dismissed the falsification of records indictment arising out of the microwave purchase on July 28, 1986, and later dismissed the tax ticket indictment on December 2, 1986. Mrs. Neely's wrongful discharge case first went to trial on June 6, 1988, but resulted in a mistrial.[4] A second trial, which began on June 12, 1989, resulted in a directed verdict in favor of Sheriff Mangum. It is from this directed verdict that Mrs. Neely now appeals.

The standard of review for directed verdicts is "whether the evidence, taken in the light most favorable to plaintiff, creates an issue of fact. The standard ... is not 'whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict....'" *Littlejohn v. ACF Indus. Corp.*, 556 F.Supp. 70, 73 (S.D.W.Va.1982) (quoting *Gunning v. Cooley*, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720 (1930)); *accord Wheatley v. Gladden*, 660 F.2d 1024, 1027 (4th Cir.1981) (reviewing standard for directed verdicts is whether "without weighing the credibility of the witnesses there can be but one conclusion as to the verdict that reasonable jurors could have reached").

█ The primary evidence which Mrs. Neely relied upon to demonstrate a discharge predicated on political motivation was her marriage to the brother of the wife of Okey Mills, a former sheriff for whom Mrs. Neely worked for several years. Mrs. Neely took the position that her discharge was prompted by the fact that neither she nor Okey Mills supported Mr. Mangum in the primary election. The other indicia of political motivation, according to Mrs. Neely, were her demotion from the chief tax deputy to the license bureau department and the concomitant salary reduction, Sheriff Mangum's commandeering of the office she had occupied as chief tax deputy, certain statements allegedly made by the Sheriff, and Sheriff Mangum's alleged interference with her health insurance benefits during her suspension. Mrs. Neely further took the position that the tax ticket and microwave indictments emanated as a result of Sheriff Mangum's desire to retal-

---

**4.** The mistrial was declared following the plaintiff's calling of Sheriff Mangum as their first witness. When Sheriff Mangum began testifying about the drug-related information he had received from the informant, plaintiff objected on the grounds that he was testifying for the first time regarding the reliability of the drug information. Plaintiff maintained that the Sheriff had refused or failed to give such testimony at his deposition taken prior to trial.

iate against her for failing to give him political support.

As the Fourth Circuit Court of Appeals recognized in *Jones v. Dodson*, 727 F.2d 1329 (4th Cir.1984), political discharge cases are analyzed differently depending on the underlying motivation for the discharge. Three categories of political discharge cases were identified in *Jones*. The first and easiest to examine is a "raw political patronage" case where the discharge results simply from party affiliation alone. *See id.* at 1335. Membership in an opposing political party, however, is not a prerequisite to establishing a partisan discharge. When, as in this case, a "nomination in the Democratic primary is tantamount to election to local office," a patronage dismissal may result from failure to support the successful Democratic candidate. *McBee v. Jim Hogg County, Tex.* 730 F.2d 1009, 1010–11 (5th Cir.1984); *see Jones*, 727 F.2d at 1334–35 n. 6. The second category involves a political dismissal predicated on "overt expressive conduct" such as political campaigning or any other type of First Amendment protected expression. *See Jones*, 727 F.2d at 1335–36. This type of dismissal requires a more complicated analysis because the inquiry necessitates a balancing of whether the "employer's 'interest in the effective and efficient fulfillment of its responsibilities to the public,' outweighs the employee's interest in free expression of the ideas." 727 F.2d at 1334 (quoting *Connick v. Myers*, 461 U.S. 138, 150, 103 S.Ct. 1684, 1692, 75 L.Ed.2d 708 (1983)). The final category is characterized as "mixed motive." A discharge of this type generally contains several identifiable motives with one motive related and the other unrelated to First Amendment protections and "will ordinarily be resolved simply by fact-finding that sorts out the motives under the *Mt. Healthy* [*see infra* ] 'but-for' test...." *See id.* at 1335.

Appellant has consistently characterized her discharge as one resulting from "raw political patronage."[5] She maintains that her suspension and ultimate discharge oc-

curred only because she chose to support a Democratic candidate other than the successful Sheriff Mangum. This case does not rise to the "overt expressive conduct" category of political discharge because Mrs. Neely does not identify any specific acts of campaigning or other protected speech for which she was discharged. *See McBee*, 730 F.2d at 1013. Under the facts of this case, we likewise do not have a "mixed motive" dismissal.

The constitutionality of dismissing public employees for partisan reasons was first addressed in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), a case in which Republican non-civil service Sheriff's office employees were discharged when a Democratic sheriff was elected. The United States Supreme Court ruled that "the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments...." *Id.* at 373, 96 S.Ct. at 2689. There is one exception to the *Elrod* ruling against patronage dismissals. In the interest of promoting "government efficiency and effectiveness" and implementing policies sanctioned by the electorate, an elected official is permitted to discharge those individuals in policymaking positions. 427 U.S. at 372, 96 S.Ct. at 2689. This exception was narrowed in *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), where the Supreme Court explained that the "ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1295. A further narrowing of the policymaker exception may have been made in *Rutan v. Republican Party of Illinois*, ―― U.S. ――, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) where the Supreme Court appears to suggest that only "high-level employees" can come within the protected purview of the *Elrod/Branti* exception while holding

---

**5.** For a thorough discussion of the history of patronage practice and the development of law in this area, *see Elrod v. Burns*, 427 U.S. 347, 353–73, 96 S.Ct. 2673, 2679–90, 49 L.Ed.2d 547 (1976).

that promotions, transfers, and recalls after layoffs based on political affiliation or support "are an impermissible infringement on the First Amendment rights of public employees." [6] *See Rutan,* —— U.S. at ——, 110 S.Ct. at 2736.

In this case, it cannot be argued and indeed there has been no allegation raised that Mrs. Neely's position as a license bureau employee was a policymaking position. Accordingly, the issue presented is simply whether Mrs. Neely lost her job because she supported a candidate other than Mr. Mangum in the primary election.

When the Sheriff renewed his motion for a directed verdict at the close of his evidence,[7] the circuit court applied the following procedural test which was first articulated in *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), in connection with an untenured school teacher's freedom of speech claim:

> Initially, in this case, the burden was properly placed upon [the school teacher] ... to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor'—or, to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him. [The teacher] ... having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to [the teacher's] ... reemployment even in the absence of the protected conduct.

*Id.* at 287, 97 S.Ct. at 576 (footnote omitted). This court has previously identified the *Mt. Healthy* test as "primarily a burden shifting device utilized at trial to pro-

tect an injured plaintiff against a summary judgment or a directed verdict." *Freeman v. Poling,* 175 W.Va. 814, 338 S.E.2d 415, 424 (1985).

Although this Court recognized in *Freeman* that "[i]t is not clear as yet whether the *Mt. Healthy* rule will be applied by the United States Supreme Court to political firings ...," we need not address the applicability issue because both parties offered *Mt. Healthy* instructions. *Id.* Utilizing *Mt. Healthy,* the trial court ruled on the directed verdict motion by first determining whether Mrs. Neely had proffered sufficient evidence to demonstrate that Sheriff Mangum's decision to discharge her was politically motivated. After examining the facts of this case in conjunction with numerous political discharge cases,[8] the trial court came to the conclusion that even viewed in the light most favorable to plaintiff, she had not, as a matter of law, met her burden of demonstrating that the "motivating factor" for her discharge was political retaliation.

We find no error in the court's conclusion that Mrs. Neely failed to meet her initial burden of demonstrating political motivation. A crucial fact which the court considered was that no one was fired following Sheriff Mangum's election. If this were a prototypical patronage dismissal, a wholesale replacement of non-civil service employees would have occurred with the change of administration and loyal supporters of Sheriff Mangum would have been rewarded with positions made available only through political discharges. *See Elrod,* 427 U.S. at 353, 96 S.Ct. at 2679. Since the appellant has chosen to advocate this case as a "raw political patronage"

---

**6.** Whether the Supreme Court meant to further tailor the *Elrod/Branti* exception to patronage dismissals, however, is subject to debate because the Court noted that it was not concerned with the "scope" of this exception based on the respondents' concession that the five employees who brought the suit did not seek positions that involved policymaking or required confidence. *See Rutan,* —— U.S. at —— n. 5, 110 S.Ct. at 2735 n. 5.

**7.** The trial court denied the Sheriff's motion for a directed verdict following the conclusion of Mrs. Neely's presentation of evidence.

**8.** *See Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Jones v. Dodson,* 727 F.2d 1329 (4th Cir.1984); *McBee v. Jim Hogg County, Tex.,* 730 F.2d 1009 (5th Cir.1984); *Freeman v. Poling,* 175 W.Va. 814, 338 S.E.2d 415 (1985).

dismissal, it is critical that *no* employees were terminated when Sheriff Mangum took office.[9]

Unlike a political patronage case, both the suspension and the discharge resulted from allegations of wrongdoing which sufficiently raised the issue of whether Mrs. Neely's continued employment would impair the all-important public image of an efficient and effective administration acting in the public's interest. Mrs. Neely's suspension occurred immediately after she was indicted for back-dating a tax ticket and her dismissal was prompted by an additional indictment which alleged falsification of records as well as information that Mrs. Neely was interfering with drug investigations.

■ Sheriff Mangum could have discharged Mrs. Neely following the first indictment had he so desired, pursuant to the authority granted him in W.Va.Code § 7–7–7 (1990) which provides, in pertinent part: "Each county official named in this section shall have the authority to discharge any of his assistants, deputies or employees by filing with the clerk of the county commission a discharge statement specifying the discharge action...." Rather than subject Mrs. Neely to immediate discharge however, Sheriff Mangum only suspended her. While Mrs. Neely argues that the Sheriff did not have the right to suspend her,[10] this Court takes the view that W.Va.Code § 7–7–7, which permits the discharge of non-civil service employees, also impliedly authorizes a sheriff to suspend a non-civil service employee when it appears that a sanction less harsh than discharge is appropriate. We regard a sus-

pension, even one without pay, as preferable to outright discharge when an employee's integrity has come under scrutiny because of an indictment.

■ The fact that both the tax ticket and microwave indictments were dismissed by the special prosecutor has no bearing on the issue of whether Mrs. Neely was wrongly discharged. The dismissal of criminal charges that prompted initial disciplinary action against a public employee does not preclude a public official from administering further disciplinary action, including discharge. Both the suspension and ultimate discharge of Mrs. Neely were justified by the Sheriff's "legitimate interest in maintaining proper discipline in the public service, to the end that ... [the] duties [of the Sheriff's office] ... [might] be discharged with efficiency and integrity." *McBee*, 730 F.2d at 1013 (citing *Connick*, 461 U.S. at 150–51, 103 S.Ct. at 1692). As a public official whose primary duty is law enforcement, Sheriff Mangum had a right to demand that his employees be free of any question of impropriety or unlawful conduct, especially when the questioned conduct was work-related.

Having concluded that the suspension and discharge were justified by the Sheriff's legitimate interest in discharging the duties of his office with efficiency and integrity, the remaining allegations of political motivation can only be viewed as "petty," as Mrs. Neely's counsel even suggested. The fact that Mrs. Neely lost her position as chief tax deputy when a new sheriff was elected does not demonstrate political retaliation. Provided that the sheriff did not remove Mrs. Neely for no

---

9. Mrs. Neely testified that two individuals chose to quit when Sheriff Mangum took office, but she readily acknowledged that Sheriff Mangum did not fire anyone. Mrs. Neely suggested that the two individuals made their decision to resign following the announcement of new hours.

10. Mrs. Neely argues that because the Sheriff had the right to discharge her at any time pursuant to W.Va.Code § 7–7–7, that he did not have the right to suspend her. She supports this position by referring to 63A Am.Jur.2d *Public Officers and Employees* § 290 (1984) which

states: "The power to suspend is generally considered as included in the power of removal for cause.... But where the power to remove at will or at pleasure exists, it has been observed that the power to suspend is not necessary and does not exist." That same section also states the rule which we adopt as controlling here: "The suspension of an officer pending his trial for misconduct, so as to tie his hands for the time being, seems to be universally accepted as fair and often necessary."

reason other than her choice of political party or faction, Sheriff Mangum was entitled to place the person of his choice in the non-civil service job of chief tax deputy. *See Branti,* 445 U.S. at 517, 100 S.Ct. at 1294. The allegation of salary reduction does not evidence political retaliation because the reduction correlates to Mrs. Neely's new position of license bureau employee. The relocation of Mrs. Neely's office is another trivial allegation which does not on its own, or combined with the other allegations, demonstrate political discrimination. In addition, the alleged statement that Sheriff Mangum told other department employees that he hoped Mrs. Neely would quit does not evince a political retaliation, only a personal opinion to which the Sheriff was entitled. Finally, we fail to see any political motivation in the Sheriff's questioning of Mrs. Neely's entitlement to insurance coverage while she was suspended without pay.[11]

Under the *Mt. Healthy* test, once the trial court determined that Mrs. Neely had failed to prove political motivation, no factual issue remained for the jury to resolve. We are convinced, as was the circuit court, that the only conclusion a jury could have reached was that Mrs. Neely was not discharged on the basis of political patronage. Accordingly, the court properly directed a verdict for the Sheriff.

Based on the foregoing, the decision of the Circuit Court of Raleigh County is hereby affirmed.

Affirmed.

---

11. Sheriff Mangum, by letter dated September 24, 1985, advised Mrs. Neely that although her insurance premium had been paid, it was his position that the insurance should have been discontinued concurrent with the date of her suspension. The record indicates, however, by Mrs. Neely's own testimony that she retained health insurance coverage until May 1986, three months following her termination.