425 S.E.2d 840

**Donald AKERS, Plaintiff Below, Appellee,**

v.

**The WEST VIRGINIA DEPARTMENT OF HIGHWAYS, Defendant Below, Appellant.**

**No. 20862.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 15, 1992.

Decided Dec. 18, 1992.

Dissenting Opinion of Justice Neely Jan. 25, 1993.

---

Kenneth H. Fisher, Fisher & Young, Huntington, for appellee.

Anthony G. Halkias, Frank S. Curia, Asst. Atty. Gen., Charleston, for appellant.

WORKMAN, Justice:

The West Virginia Department of Highways ("Department") appeals from a June 28, 1991, order of the Circuit Court of Wayne County declaring West Virginia Code § 29–6–4(d) (Supp.1992) unconstitutional and ordering that Donald Akers, Appellee, be reinstated to his former position as Wayne County Maintenance Superintendent (hereinafter sometimes referred to as "CMS" or "Superintendent"). After examining the applicable statute and precedent, we concur with the decision of the trial court that West Virginia Code § 29–6–4(d) is unconstitutional insofar as it applies to the position of CMS. Accordingly, this Court affirms the decision of the circuit court.

Mr. Akers was appointed to the Wayne County Superintendent's position in June 1985 during the administration of Governor Arch A. Moore, Jr. The parties have stipulated that Mr. Akers' employment as the CMS resulted from his political affiliation with the Republican party.[1] Mr. Akers testified that as CMS he had the responsibility of maintaining 860 miles of roads in Wayne County and that he supervised 50 department employees, 20 to 25 Community Work Employment Program employees, and work release inmates.

---

1. At the time Mr. Akers was hired as the Wayne County Superintendent, the position was vacant because the individual who previously held that position had retired for health reasons.

During the hearings below, much of the testimony centered on the job duties and responsibilities associated with the position of CMS. The Department offered witnesses to support its contention that the Superintendent's position is that of a "policymaker" and accordingly requires the holder to share the same political affiliation as the governor of the State. Appellee, on the other hand, offered evidence that he was merely an employee and that his discretion was limited as he was required to seek the approval of the District Engineer with regard to a proposed weekly work schedule.

During the 1989 legislative session, a bill was passed amending West Virginia Code § 29–6–4 in part by adding a new subsection d. That subsection provides that:

> The Legislature finds that the holding of political beliefs and party commitments consistent or compatible with those of the governor contributes in an essential way to the effective performance of and is an appropriate requirement for occupying certain offices or positions in state government, such as the secretaries of departments and the employees within their offices, the heads of agencies appointed by the governor and, for each such head of agency, a private secretary and one principal assistant or deputy, all employees of the office of the governor including all employees assigned to the executive mansion, as well as any persons appointed by the governor to fill policy-making positions and county road supervisors or their successors, in that such offices or positions are confidential in character and/or require their holders to act as advisors to the governor or his appointees, to formulate and implement the policies and goals of the governor or his appointees, or to help the governor or his appointees communicate with and explain their policies and views to the public, the Legislature and the press.

West Virginia Code § 29–6–4(d) (eff. July 1, 1989). In November 1989, the Democratic candidate for governor, Gaston Caperton, won the election over the incumbent governor, Arch A. Moore, Jr. When Gaston Caperton took office as governor in January 1989, he appointed Kenneth M. Dunn as Secretary of the West Virginia Department of Transportation.

On July 20, 1989, Mr. Dunn issued a letter to the thirty-five Superintendents [2] which quoted newly-enacted West Virginia Code § 29–6–4(d) and advised the incumbent Superintendents that they had the option of transferring to "a position of Area Maintenance Manager in the local District Office" or remaining in their respective CMS position until a final determination was made regarding "the future characteristics and requirements of the County Maintenance Superintendent position." Mr. Akers responded to his letter from Mr. Dunn by issuing a reply letter dated July 31, 1989, rejecting the transfer and stating that

> [i]n my opinion, the above referenced Code section [W.Va.Code § 29–6–4(d)] attempts to define the position of County Maintenance Superintendent as a policy-making position, which it is not and has never been during the periods of time that I have occupied the position.... It is my opinion that the above referenced Code section constituting a legislative finding that the County Maintenance Superintendent should have the same political affiliation as the Governor is an unconstitutional infringement by the Legislature upon the Executive Branch and is an attempt by the Legislature to get the Governor to return to politics of the past where County Maintenance Superintendents were fired with each change of administration.

By certified letter dated September 11, 1989, Mr. Akers was transferred effective October 1, 1989, from his position as Wayne County Maintenance Superintendent to Area Maintenance Manager position at the District Two Headquarters in Huntington, West Virginia. Although Appellee had no specific duties assigned to him in his new position, Mr. Akers continued to receive the same salary as he had received while holding the position of CMS.

---

**2.** Each of the incumbent Superintendents was a registered Republican.

A Democrat was appointed to replace Mr. Akers as the new Wayne County Superintendent.

On September 21, 1989, Mr. Akers filed a grievance pursuant to West Virginia Code §§ 29–6A–1 to 29–6A–11 (Supp.1992), alleging that his transfer from CMS to the position of Area Maintenance Manager "was taken solely as a result of my political beliefs and party affiliations." At the fourth and final level of the grievance procedure, the hearing examiner held that "[t]he West Virginia Education and State Employees Grievance Board is not empowered to determine the constitutionality of statutes" and that "*W. Va. Code* § 29–6–4(d) unambiguously allowed Secretary Dunn to remove Grievant from the County Supervisor position because his party commitments were not consistent with that of Governor Caperton and therefore Grievant did not establish his transfer was illegal."

Mr. Akers appealed the denial of his grievance to the Circuit Court of Wayne County pursuant to West Virginia Code § 29–6A–7. The appeal was heard by Judge Dan O'Hanlon of the Cabell County Circuit Court upon the recusal of Judge Robert G. Chafin of the Wayne County Circuit Court. In its final order, the Circuit Court found that:

4. Plaintiff/Petitioner's transfer was done solely because of his membership in the Republican political party;

. . . . .

6. The position of County Maintenance Superintendent (or County Road Supervisor, as the position is called in Code Section 29–6–4[d]) is not a policy-making position, is not confidential in character, does not require the employee holding such position to formulate or implement the policies and goals of the Governor or his appointees, does not communicate with or explain the Governor's policies or views to the public, legislature or the press, and the patronage transfer of the individual holding such position does not further a vital governmental interest justifying restraints upon

the person who holds such position freedom of speech rights under the First and Fourteenth Amendments to the United States Constitution, nor is political affiliation or association a necessary requirement for the effective performance of the duties of the position of the County Maintenance Superintendent;

7. The legislature enacted West Virginia Code § 29–6–4(d) insofar as the same applies to County Maintenance Superintendents solely as a ruse or ploy to enable the Governor to terminate or transfer County Maintenance Superintendents who were Republican office holdovers in contravention of the rights set forth in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Rutan v. Republican Party of Illinois*, 497 U.S. [62], 110 S.Ct. [2729], 111 L.Ed.2d 52 (1990); . . . .

Following these findings, the circuit court ruled that West Virginia Code § 29–6–4(d) was unconstitutional, ordered that Mr. Akers be reinstated to his position as CMS, and awarded him back pay, if any, attorney's fees, and costs. It is from this final order of the circuit court that the Department now appeals.

I.

Historically, Superintendents have been replaced whenever a new administration takes office. When former Governor Arch A. Moore, Jr., took office in 1985, all the incumbent Superintendents were replaced with individuals whose political affiliation was Republican. Appellee was one of those Republicans who gained a CMS position because of political partisanship in 1985. Superintendents are not afforded the protection of civil service statutes.[3] Accordingly, the numerous CMS positions throughout the State historically have been filled at least partially on the basis of political patronage.

We recently summarized the United States Supreme Court decisions on political

---

**3.** When the Legislature extended civil service protection to county employees in 1983, Super-

intendents were not included in the list of employees slated to receive such coverage.

patronage in *Neely v. Mangum*, 183 W.Va. 393, 396 S.E.2d 160 (1990), by noting that

[t]he constitutionality of dismissing public employees for partisan reasons was first addressed in *Elrod v. Burns*, 427 U.S. 347 [96 S.Ct. 2673, 49 L.Ed.2d 547] (1976), a case in which Republican non-civil service Sheriff's office employees were discharged when a Democratic sheriff was elected. The United States Supreme Court ruled that 'the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments....' *Id.* at 373, 96 S.Ct. at 2689. There is one exception to the *Elrod* ruling against patronage dismissals. In the interest of promoting 'government efficiency and effectiveness' and implementing policies sanctioned by the electorate, an elected official is permitted to discharge those individuals in policymaking positions. 427 U.S. at 372, 96 S.Ct. at 2689. This exception was narrowed in *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), where the Supreme Court explained that the 'ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.' 445 U.S. at 518, 100 S.Ct. at 1295. A further narrowing of the policymaker exception may have been made in *Rutan v. Republican Party of Illinois*, [497] U.S. [62], 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) where the Supreme Court appears to suggest that only 'high-level employees' can come within the protected purview of the *Elrod/Branti* exception while holding that promotions, transfers, and recalls after layoffs based on political affiliation or support 'are an imper-

missible infringement on the First Amendment rights of public employees.' *See Rutan*, [497] U.S. at [75], 110 S.Ct. at 2736.

183 W.Va. at 396–97, 396 S.E.2d at 163–64; *see also Adkins v. Miller*, 187 W.Va. 774, 421 S.E.2d 682 (1992). (recognizing right of governmental employees to be free from employment decisions based solely on political grounds under certain circumstances).

The *Elrod* and *Branti* decisions, as well as their progeny, stand for the proposition that "political affiliation is an appropriate requirement when there is a rational connection between shared ideology and job performance...." *Savage v. Gorski*, 850 F.2d 64, 68 (2nd Cir.1988). As an aid to determining whether shared political ideology is a legitimate prerequisite for holding a particular government position, this Court, like the Fourth Circuit Court of Appeals in *Stott v. Haworth*, 916 F.2d 134 (4th Cir.1990), adopts the following two-part test created by the First Circuit Court of Appeals for resolving cases that involve patronage dismissals:[4]

A threshold inquiry, which derives from *Branti*, involves examining whether the position at issue, no matter how policy-influencing or confidential it may be, relates to 'partisan political interests ... [or] concerns.' 445 U.S. at 519, 100 S.Ct. at 1295. That is, does the position involve government decisionmaking on issues where there is room for political disagreement on goals or their implementation? Otherwise stated, do party goals or programs affect the direction, pace, or quality of governance?

If this first inquiry is satisfied, the next step is to examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office hold-

**4.** The fact that Appellee was not discharged from government employment does not eliminate the *Branti–Elrod* analysis. Prior to *Rutan,* the principles that underlie the unconstitutionality of patronage dismissals were recognized by the Fourth Circuit Court of Appeals in *Delong v. United States,* 621 F.2d 618 (4th Cir.1980), to apply similarly to practices "that can be determined to be the substantial equivalent of dis-

missal." *Id.* at 624. While the use of the "substantial equivalent of a dismissal" standard to determine the constitutionality of an alleged patronage practice is no longer valid after *Rutan,* the United States Supreme Court left no question that employment decisions such as promotions, transfers, and recalls after layoffs cannot be based on political affiliation or support. 497 U.S. at 75, 110 S.Ct. at 2737.

er whose function is such that party affiliation is an equally appropriate requirement. We would note that in conducting this inquiry, courts focus on the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office.

*Stott*, 916 F.2d at 141–42 (quoting *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 241–42 (1st Cir.1986), *cert. denied*, 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987)).

■ The United States Supreme Court in *Rutan* held that:

our conclusions in *Elrod, supra,* and *Branti, supra,* are equally applicable to the patronage practices at issue here [promotions, transfers, and recalls]. A government's interest in securing effective employees can be met by discharging, demoting or transferring staffmembers whose work is deficient. A government's interest in securing employees who will loyally implement its policies can be adequately served by choosing or dismissing certain high-level employees on the basis of their political views.

497 U.S. at 75, 110 S.Ct. at 2737. Given the holding in *Rutan*, there is no question that employment decisions to transfer public employees that are based on party affiliation and support constitute "an impermissible infringement on the First Amendment rights of public employees." 497 U.S. at 75, 110 S.Ct. at 2737. The only exception to this ruling are employment changes effectuated for the purpose of enabling the hiring of "certain high-level employees on the basis of their political views" necessary to "loyally implement ... [an administration's] policies." *Id.* Accordingly, unless the CMS is a high-level position which properly requires shared political affiliation or philosophy for effective job performance, Appellee's transfer to the position of Area Maintenance Manager was an unconstitutional infringement on his First Amendment rights of belief and association.

■ The Department applies the two-part test adopted in *Stott* for identifying those positions for which party affiliation is appropriately a prerequisite and concludes that the position of CMS necessarily requires similar political ideology with that of the governor "because the position involves both political interest and concern." *See* 916 F.2d at 141–42. To bolster this conclusion, the Department states that "the maintenance of local and county roads is an issue on which state government and its governor is judged["] and that road maintenance "has, and will continue to be, a political issue in the gubernatorial campaigns." Having satisfied the first part of the First Circuit inquiry, the Department proceeds to address the second part of the test which requires an examination of "the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement." *Stott,* 916 F.2d at 142. The Department claims that the second aspect of the test is easily met because the CMS was a communicator, the primary implementer of the governor's policies at the county level, and a policymaker. *See id.*

Appellee qualified as a "communicator," according to the Department, because he was the "front line man and representative of the Department in Wayne County" and as such was required to respond to the maintenance complaints of both county employees and citizens. The Department relies on witness testimony that Mr. Akers had the responsibility for determining which Wayne County roads would be maintained to support its position that Appellee was the primary implementer of the governor's policies at the local level. Concerning the policymaker element of the test, the Department conclusorily decides that the CMS position is a policymaking position by referring back to the *Elrod* definition of policymaker as "[a]n employee with responsibilities that are not well defined or are of a broad scope...." 427 U.S. at 368, 96 S.Ct. at 2687.

A review of the evidence taken in the administrative hearings below refutes the Department's position that the CMS has "almost complete discretion and control

over the routine maintenance operations performed in the county by his organization." The job description on record with the Department at all times pertinent to this matter provides that the Superintendent "plans and directs all routine county maintenance operations in accordance with established department procedures and policies.... Work is performed under the general direction of an Engineer." The CMS is required to complete a weekly work schedule outlining his proposal for the coming week with regard to workers, materials, and specific jobs to be performed. This proposed work schedule is required to be submitted to the district engineer's office for review and possible changes. The final authority on the scheduled use of equipment and materials rests with the district engineer and not the CMS.

Notwithstanding the Department's attempts to present the CMS as a policymaker, we share the lower court's view that the evidence does not support the Department's position. The all-encompassing objective of the Superintendent's position is to maintain the county road system. Based on this Court's review of the record below, it appears that the duties of the CMS are "limited ... [with] well-defined objectives." *Elrod,* 427 U.S. at 368, 96 S.Ct. at 2687. Furthermore, his duties are not of a broad scope, nor does he "act[ ] as an advisor or formulate[ ] plans for the implementation of broad goals." *Id.* Accordingly, we agree with the circuit court's conclusion that the position of CMS cannot be viewed as one involving policymaking. *See Abraham v. Pekarski,* 537 F.Supp. 858, 862 (E.D.Pa.1982), *judgment aff'd in part and appeal dismissed in part,* 728 F.2d 167 (3rd Cir.1984), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984) ("[a]lthough he [Director of Roads and Public Property] was vested with some discretion in the execution of his duties, such as determining which potholes should be filled, plaintiff's position did not empower him to make policy decisions"). Finding no factual or legal error, we uphold the trial court's ruling that the position of CMS does not require its holder to share the same political affiliation or association as

the governor to effectively perform the duties attendant to such position.

## II.

Finally, we address the constitutionality of West Virginia Code § 29–6–4(d). Appellee has challenged this statutory provision as being violative of his First Amendment right of free speech. When such a challenge is made, the statute is presumptively invalid. *Walker v. Dillard,* 363 F.Supp. 921, 926 (W.D.Va.1973), *rev'd on other grounds,* 523 F.2d 3 (4th Cir.), *cert. denied,* 423 U.S. 906, 96 S.Ct. 208, 46 L.Ed.2d 136 (1975). Because of this presumption, the Department had the burden of proving the statute's validity. *See Elrod,* 427 U.S. at 362, 96 S.Ct. at 2684. Recognizing that "the prohibition on encroachment of First Amendment protections is not an absolute[,]" the Supreme Court in *Elrod* ruled that an otherwise invalid statute could be enforced by demonstrating that a vital government interest is advanced through implementation of the statute. *See id.* at 360, 96 S.Ct. at 2683.

The Department clearly failed to meet the following test established in *Elrod* for the permissible encroachment on a public employee's First Amendment right:

> In short, if conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights.

427 U.S. at 363, 96 S.Ct. at 2685. In response to the *Elrod* test, we note that the record in this case contains no evidence that the Department demonstrated the existence of a vital government interest which was furthered by the Appellee's transfer. Certainly, the loss of the constitutionally protected rights at issue here is not outweighed by the articulation of any benefit the Department might claim to receive by having Superintendents whose political affiliation comports with that of the

governor. Accordingly, we hold that West Virginia Code § 29–6–4(d) is unconstitutional insofar as it applies to the position of CMS. We do not rule that West Virginia Code § 29–6–4(d) is unconstitutional *in toto* because a factual inquiry must be performed with regard to each public employee listed therein to determine whether their respective position requires shared political ideology for effective job performance.

Based on the foregoing opinion, the decision of the Circuit Court of Wayne County is hereby affirmed.

Affirmed.

NEELY, J., dissents and reserves the right to file a dissenting Opinion.

NEELY, Justice, dissenting:

The majority's decision today twists the knife in the wound that this Court inflicted on the voters and the political process in *Adkins v. Miller,* 187 W.Va. 774, 421 S.E.2d 682 (1992). Today's decision makes it clear that the majority has decided that the *Constitution of the United States* requires the State of West Virginia to employ a civil service system for all of its employees.[1] In yesteryear, the average voter—a person unable to make political campaign contributions, unable to entertain lavishly, and unable even to flatter convincingly—had at least one weapon in his never ending battle to obtain a responsible, accountable government: his vote! After the opinion today, this Court is saying that no matter how dissatisfied the average voters of West Virginia are with *their government,* they can no longer demand change in the oldest democratic form; they can no longer vote the bastards out! The working class should be out in the streets because as accountability decreases, the only thing that matters in elections becomes MONEY and MORE MONEY. Today's decision drives home to all citizens of West Virginia that *only people with money count in politics.*

In *Adkins,* 187 W.Va. 774, 421 S.E.2d 682 (1992), this Court tragically took a giant step toward *dirigist,* permanent government by declaring that the *Legislature* does not have the power to limit the term of a deputy sheriff to the term of the sheriff who appoints him. Now today's decision denigrates the prerogatives of the *Governor* and flies in the face of significant constitutional precedent to the effect that when the governor acts in accordance with a clear Legislative provision, such an action "should be 'supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.' " *Adkins,* 187 W.Va. at 788, 421 S.E.2d at 696 (1992) (Neely, J., dissenting) (quoting *Youngstown Sheet & Tube v. Sawyer,* 343 U.S. 579, 637, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1952) (Jackson, J., concurring)).

Deference to the legislative determination of "policymaker" status is fully supported, indeed required, by *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), and their progeny. Although, in *Elrod,* the court allowed patronage dismissals of only "policy-making" or "confidential" employees[2], by *Branti* and *Rutan,* the test was broadened to "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for effective performance of the public office involved." *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295; *Rutan,* 497 U.S. at 71, 110 S.Ct. at 2734. The *Elrod–Branti–Rutan* test involves "striking a balance between the interests of the [government employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Mount Healthy City School*

---

**1.** Although it is not in my copy of the *Constitution of the United States,* the majority's copies apparently contain a heretofore undiscovered Amendment XXVII, "Thou shalt have a civil service system for all employees."

**2.** *Elrod,* 427 U.S. at 367, 96 S.Ct. at 2686 (plurality opinion).

*District Board of Education v. Doyle*, 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977) (quoting *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968)); *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983).[3]

Applying that test to the situation in the case before us leads to one inescapable conclusion: that the County Maintenance Superintendent (superintendent) position is one for which "party affiliation is an appropriate requirement for effective performance of the public office involved." Traditionally, superintendents have been changed whenever an administration changes. The Legislature has never covered the position under civil service statutes, and in *W.Va.Code* 29–6–4(d) [1990] the Legislature explicitly defined the position of superintendent as having significant policy-making responsibilities and that:

> the holding of political beliefs and party commitments consistent or compatible with those of the governor contributes in an essential way to the effective performance of and is an appropriate requirement for occupying certain offices or positions in state government such as … county road supervisors or their successors.

The Legislature has determined that it is important to the effective administration of the highways that County Maintenance Superintendents be of the same political party as the Governor. A review of the job description underscores the correctness of that determination; to perform the job of County Maintenance Superintendent, one must exercise significant political judg-ment. Although the majority would like to bureaucratize the vast number of decisions required of a superintendent, it would take a dozen top professors at the Princeton Institute of Advanced Studies constantly to feed data into a Cray supercomputer in order to replicate the task. For example, a superintendent must respond "to maintenance complaints throughout the county on a 24–hour basis and [recommend] corrective actions"; a superintendent must "determine necessary preventative measures seasonally to decrease the likelihood of road accidents and [dispatch] the snow removal and ice control crews"; and a superintendent must do all of that while ensuring "that completed work remains within allocated budget limits."

To see what kind of challenge is faced by a superintendent, suppose one street in a county is heavily populated by doctors. The doctors all own expensive cars with great suspension systems such as a Mercedes Benz or BMW. The ride of their cars over uneven pavement makes them feel as if they are floating on air. However, the doctors are always on call and need to get out in emergencies. Doctors, then, prefer snow and ice removal to road maintenance. On another county street lives teachers and other state government employees that cannot afford anything better than used Ford Escorts. Their cars get destroyed by potholes and poor road maintenance. However, they have no need to get anywhere when the weather deteriorates because the schools close and the government grinds to a halt. These government employees prefer road maintenance to snow and ice removal. The job of the County Maintenance

---

**3.** Furthermore, the majority either chooses to ignore or fails to comprehend the entire rationale behind *Elrod* and its progeny. *Elrod, et al.* were designed to prevent an executive officer, such as a governor, from using political affiliation as a basis for unfavorable job actions *where political affiliation was not at all necessary to the performance of the job.* In this case, the legislature clearly defined the role of a County Maintenance Superintendent as one that requires political affiliation. This was not a broad statement that all state employees need be aligned politically with the governor, but a narrow, specifically considered list of jobs for which party affiliation is "essential … to the effective performance of and is an appropriate requirement for … county road supervisors or their successors." *W.Va.Code* 29–6–4(d) [1990]. The United States Supreme Court invited legislatures clearly to define for which government jobs party affiliation is an appropriate requirement with *Elrod, Branti,* and *Rutan.* The West Virginia Legislature accepted that challenge and created *W.Va.Code* 29–6–4(d) [1990]. By getting hung up on the term "policymaker" rather than looking to the actual meaning of the *Elrod, Branti* and *Rutan* opinions, this Court has appointed itself as the sole administrator of an allegedly constitutionally-mandated civil service system.

Superintendent is inherently political: to allocate scarce resources in such a way that it benefits his constituents (the residents of the county). The weighing of the variable needs of these residents involves a political choice, one that reflects directly on the governor. Clearly the governor needs the ability to ensure that the person he appoints to make such choices is someone who will make the choices the same way that the governor would make them.

In the face of *W. Va. Code* 29–6–4(d) and the actual role of the County Maintenance Superintendent, the majority claims that such a provision (as applied to County Maintenance Superintendents) is unconstitutional. However, the majority supplies virtually no authority for its holding. They obviously did not apply the U.S. Supreme Court test to determine "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for effective performance of the public office involved." *Branti*, 445 U.S. at 518, 100 S.Ct. at 1294; *Rutan*, 497 U.S. at 71, 110 S.Ct. at 2734. Clearly that showing has been made. The sole (and wholly inadequate) basis for the majority's decision to overturn a clear legislative provision is a case from the Eastern District of Pennsylvania, *Abraham v. Pekarski*, 537 F.Supp. 858 (E.D.Pa.1982), *affirmed in part and appeal dismissed in part* 728 F.2d 167 (3d Cir.1984), *cert. denied* 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984). However, had anyone from the majority bothered to read *Abraham*, he or she would have learned that the U.S. District Court dismissed the *Elrod–Branti* claim on summary judgment:

> The defendants, without filing any affidavits, moved for summary judgment on [two] theories. The trial court granted their motion with respect to the *Elrod–Branti* ground, but held that Abraham did have a Pennsylvania law property interest in employment.

*Abraham*, 728 F.2d at 170. That court's only holding on the applicability of *Elrod* or *Branti* was:

The short of it is that *Elrod* and *Branti* do not extend to Abraham's case. He has not been penalized for an exercise of freedom of association. Nor has he been penalized for preferring the course of nonassociation. We have not yet reached a point in the development of *Elrod* and *Branti* where public employees may override their superiors because they have a different view of what public policy should be.

*Abraham*, 537 F.Supp. at 866.[4]

Even if we were to adopt the view of the majority that we can derive some guidance from *Abraham*, that guidance is not very persuasive. First, the action in *Abraham* was a naked exercise of executive power with no "legislative" determination that the job should be a political appointment. Such an action is in the "zone of twilight" where "any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (Jackson, J., concurring) (quoted in *Adkins*, 187 W.Va. at 786, 421 S.E.2d at 694 (Neely, J., dissenting)). In the case before us, the legislature determined that certain positions, including County Maintenance Superintendent, require a political affiliation with the governor in order to be performed effectively. The governor's action pursuant to this statute must be presumed valid and the burden of persuasion rests "heavily upon any who might attack it." *Youngstown Sheet & Tube*, 343 U.S. at 637, 72 S.Ct. at 871 (Jackson, J., concurring) (quoted in *Adkins*, 187 W.Va. at 786, 421 S.E.2d at 694 (Neely, J., dissenting)). Second, Pennsylvania is not West Virginia. As anyone who has spent any time in West Virginia politics should know, the two most important political issues in West Virginia over the past hundred years have been education and the decision of which roads get built or paved and which roads remain cow paths. The superintendent is the offi-

---

**4.** That court did speculate, in an extreme case of *obiter dicta*, that the "policy-maker" exception might not apply to Mr. Abraham. However, that issue was not even addressed by the defendants in that case and can hardly be viewed as applicable to the situation before us today.

cial who actually makes these crucial determinations for secondary roads in a county. In order to have a responsive government that puts roads where the people want them, the superintendent should not be an entrenched bureaucrat with his own political fiefdom, but should be an agent of the *elected* governor.

The majority's opinion would be comical were it not so tragic. Here the majority is substituting its own guess of whether a superintendent is a "policymaker" for a carefully considered legislative determination that party affiliation is, to quote *Branti,* "an appropriate requirement for effective performance of the public office involved." *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295; *Rutan,* 497 U.S. at 71, 110 S.Ct. at 2734. By getting hung up on the term "policymaker" without actually looking at what the test is supposed to mean, the majority has created an error of the first order.